IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Robert Brooks, #216605, )<br>)<br>             Plaintiff, )<br>)<br>     vs. )<br>)<br>Wantonta Golden, Correctional )<br>Officer; Wade Byrd, Lieutenant; )<br>Charles Williams, Sgt.; Jonathan )<br>Bennett, Sgt.; John Randell, Captain; )<br>Florence Mauney, Captain; Richard )<br>Bazzel, Warden; Michael Fowler, )<br>Grievance Clerk; R.L. Turner, )<br>Disciplinary Hearing Officer; sued in )<br>their individual and official capacity )<br>respectively, )<br>)<br>             Defendants. )<br>_____)  | Civil Action No. 6:06-1234-MBS-WMC<br><br>**REPORT OF MAGISTRATE JUDGE** |

This matter is before the court on the defendants' motion for summary judgment. In his complaint, the plaintiff, a state court prisoner proceeding *pro se,* alleges that the defendants have refused to provide him meal trays, improperly charged him with disciplinary offenses, improperly failed to process or handle his grievances, and improperly convicted him of disciplinary offenses. The plaintiff claims that the actions of the defendants violated his constitutional rights.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Local Rule 73.02(B)(2)(d), D.S.C., this magistrate judge is authorized to review all pretrial matters in cases filed under Title 42, United States Code, Section 1983.

The defendants filed a motion for summary judgment on September 20, 2006. By order filed September 21, 2006, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the plaintiff was advised of the summary judgment dismissal procedure and the

possible consequences if he failed to adequately respond to the motion. On November 20, 2006, the plaintiff filed a response to the motion. On December 5, 2006, the defendants filed a reply brief.

## **FACTS PRESENTED**

At the time of the incidents described in his complaint, the plaintiff was incarcerated at Perry Correctional Institution serving a 25-year sentence for armed robbery. While at Perry, the plaintiff was charged with striking SCDC employee Ben Outlaw. A disciplinary hearing on this charge was held on October 12, 2005. Disciplinary Hearing Officer ("DHO") Richard Turner found the plaintiff guilty of the charge. On September 4, 2005, the plaintiff was charged with sexual misconduct by defendant Officer Wantonta Golden. A hearing was held on the matter on September 28, 2005, and the plaintiff was found guilty by DHO Turner. On November 6, 2005, the plaintiff was charged with threatening to inflict harm on another inmate. The DHO found the plaintiff guilty of this charge after a hearing held on November 23, 2005. On February 24, 2006, Officer Golden again charged the plaintiff with sexual misconduct for masturbating. The DHO found the plaintiff guilty of this charge at a hearing on March 8, 2006. Officer Golden again charged the plaintiff with sexual misconduct for masturbating on April 4, 2006. A hearing was held on April 10, 2006, in which the DHO found the plaintiff guilty. Another female officer, Officer Carwile, charged the plaintiff with sexual misconduct for masturbating on April 11, 2006. The plaintiff was found guilty of this charge after a hearing before the DHO on April 24, 2006 (Turner aff.).

At the March 8, 2006, hearing, the plaintiff brought with him a number of documents pertaining to issues with Officer Golden. As the documents did not pertain to the charge at hand, the DHO did not allow the plaintiff to put all the documents into evidence. However, the DHO did offer to let the plaintiff put several documents into the

record since he was alleging that Officer Golden was retaliating against him. The plaintiff refused to so. At the April 10, 2006, hearing, the plaintiff became disrespectful and hostile, and he made a number of threatening comments concerning DHO Turner and Officer Golden. As a result of his behavior, the plaintiff was removed from the hearing room. The plaintiff also had to be removed from the hearing room due to his behavior in the hearing conducted on November 23, 2005. At one of the hearings, DHO Turner recommended that Officer Golden file for a separation involving the plaintiff. In such a case, generally the inmate is moved to another institution. DHO Turner stated that he had seen the plaintiff's behavior deteriorate to the point where he was making serious threats concerning Officer Golden that were particularly vicious and specific, which gave him concern (Turner aff.). Since the filing of his complaint, the plaintiff has been transferred to Lieber Correctional Institution.

## APPLICABLE LAW AND ANALYSIS

Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to summary judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that

a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir. 1985), *overruled on other grounds,* 490 U.S. 228 (1989). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson,* 477 U.S. at 248. Accordingly, when Rule 56(e) has shifted the burden of proof to the non-movant, he must provide existence of every element essential to his action which he bears the burden of adducing at a trial on the merits.

***Administrative Remedies***

As noted above, the plaintiff has alleged a litany of claims. The defendants contend that the plaintiff has failed to exhaust his administrative remedies as to a number of his prison conditions claims. This court agrees. Section 1997e(a) of the Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison

conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).  As the Supreme Court has observed:

> Beyond doubt, Congress enacted §1997e(a) to reduce the quantity and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case. In some instances, corrective action taken in response to an inmate's grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation. In other instances, the internal review might filter out some frivolous claims. And for cases ultimately brought to court, adjudication could be facilitated by an administrative record that clarifies the contours of the controversy.

*Porter v. Nussle*, 534 U.S. 516, 524-25 (2002) (citations and quotations omitted).

The defendants have submitted the affidavit of Michael Fowler in support of their motion.  Mr. Fowler is employed by the South Carolina Department of Corrections ("SCDC") and is a Grievance Coordinator at Perry, where the plaintiff was incarcerated at the time of the events complained of in his complaint.  The Inmate Grievance System for SCDC provides a method by which inmates may seek formal review of complaints relative to disciplinary hearing appeals, classification appeals, department policies/procedures, directives, or conditions which directly affect an inmate.  The initial step in the Inmate Grievance System is the filing of a Step One Grievance.  A Step One Grievance is investigated by a grievance coordinator and a decision is generally issued by the warden of the institution where the inmate is housed.  If the inmate disagrees with the warden's decision on the Step One Grievance, the inmate can file a Step Two Grievance with the SCDC (Fowler aff. ¶¶ 4-8).

The plaintiff alleges that incidents occurred on a number of dates which he sets forth in his complaint.  The plaintiff references incidents that he alleges occurred on September 4, 12, and 24, 2005; October 1, 2005; November 8, 2005; December 17, 18, 19,

23, and 24, 2005; January 22 and 23, 2006; February 1, 23, and 24, 2006; and April 4 and 7, 2006. The plaintiff also referenced additional dates in his complaint, but the additional dates dealt with either grievances that he had filed or the dates of disciplinary hearings.

The plaintiff filed a number of grievances complaining of issues in relation to his confinement.[1] According to Mr. Fowler, the plaintiff filed a grievance on October 1, 2005, alleging that defendant Golden denied him his meal tray on September 4 and 12, 2005, and October 1, 2005. When the grievance was denied, the plaintiff filed a Step 2 Grievance (Fowler aff. ¶¶ 16-18). As to the remaining grievances filed by the plaintiff during his incarceration at Perry, they either did not involve any issues raised in the complaint or a Step 2 Grievance was not filed (Fowler aff. ¶¶ 19-42). Accordingly, only the issues raised as to defendant Golden in the plaintiff's October 1, 2005, grievance will be considered on the merits. The plaintiff has failed to exhaust his administrative remedies as to his remaining prison conditions claims, and those claims should be dismissed.

*Prison Conditions*

During his incarceration at Perry, the plaintiff was housed in the Special Management Unit ("SMU"). The plaintiff alleges that defendant Officer Golden failed to provide him with his food trays and that other officers also failed to do same. He further alleges that Officer Golden improperly wrote him up for disciplinary offenses, that the grievances he submitted were not handled appropriately, and that he was improperly convicted of disciplinary offenses. In their affidavits submitted in support of summary judgment, Officer Golden, along with additional defendants, stated that she was assigned to work in the SMU. Officer Golden primarily worked in the control room and ordinarily would not be on the actual wing of the SMU where the plaintiff was housed. Officer Golden

---

[1]The plaintiff's allegations concerning his disciplinary convictions will be addressed below.

6

and the additional defendants stated that they were not aware of any issues that the plaintiff had with Officer Golden until she charged him with sexual misconduct for masturbating in September of 2005 and, after that time, the plaintiff had a great deal of animosity toward her and expressed this on a number of occasions (Outlaw, Golden, Byrd, Williams and Johnson affs.).

The officers stated that the procedure in SMU is that the inmates will be provided food trays through a slot in their cell door. The slot, called the "food flap," is opened and the trays are provided to inmates. The only time an inmate would not be given a meal is if they refused to accept it. Officer Golden, along with additional defendants, testified that at no time were they aware that Officer Golden or any defendant refused to provide the plaintiff with a food tray or drink. However, there were times when the plaintiff refused to accept a tray from Officer Golden (Outlaw, Golden, Byrd, Williams and Johnson affs.).

After Officer Golden charged the plaintiff with sexual misconduct, the plaintiff had a great deal of animosity toward Officer Golden. The officers stated that Officer Golden remained primarily in the control room, but if she left the control room and came on the wing, the plaintiff would immediately begin screaming, cursing, and calling her names. This would occur even if Officer Golden was nowhere near the plaintiff, but simply entered the wing and was seen by the plaintiff. Further, when the plaintiff would leave the wing to go for recreation, for a doctor's visit, or for a disciplinary hearing, he would be required to walk past the control room. He generally would not make any type of comment while he was leaving to go to recreation or to other areas, but when he was being taken back to his cell, he would yell profanities and call Officer Golden names when he walked past the control room. On some occasions, he stopped at the control room and would yell at her or would tap on the window and then stare at her in a menacing fashion (Outlaw, Golden, Byrd, Williams and Johnson affs.).

7

Several of the defendants testified that Officer Golden ordinarily delivered trays to inmates only once every three to four weeks as she generally worked in the control room. Though Officer Golden did not usually deliver trays to inmates, it reached the point where the plaintiff's behavior was so disruptive to the unit when she was assisting in delivering trays to inmates, another officer would give the plaintiff his tray in order to avoid the disruption and to keep him from inciting other inmates with his behavior (Outlaw, Golden, Byrd, Williams, and Johnson affs.).

Even officers who were not assigned to SMU observed the plaintiff's animosity toward Officer Golden. Corporal Martin is not assigned to SMU, but serves inmates with disciplinary offenses. He testified that he never observed Officer Golden take any improper action toward the plaintiff, but he observed the plaintiff make comments about Officer Golden and threaten her on a number of occasions (Martin aff.).

Several defendants testified that if Officer Golden was serving food trays or drinks, the plaintiff would immediately begin complaining. Her procedure was to simply put the tray on the food flap, and she would not say anything to him on these occasions. The defendants stated that on several occasions, the plaintiff would not take the food tray from Officer Golden, and when she took the tray away because he had refused to accept it, he would complain he had not been given a tray and demand that someone else provide the tray to him. The defendants contend that though inmates are provided a tray unless they refuse, inmates are not allowed to choose who delivers their tray to them.

The Eighth Amendment expressly prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. To succeed on any Eighth Amendment claim for cruel and unusual punishment, a prisoner must prove: (1) objectively, the deprivation of a basic human need was sufficiently serious, and (2) subjectively, the prison officials acted with a "sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991); *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). "'[I]t is obduracy and wantonness,

not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock.'" *Moore v. Winebrenner*, 927 F.2d 1312, 1316 (4th Cir. 1991) (quoting *Whitley v. Albers,* 475 U.S. 312, 319 (1986)).  This court agrees with the defendants that the plaintiff has failed to establish a claim that rises to the level of a constitutional deprivation with regard his claim that defendant Golden and other defendants denied him his food tray on several occasions.  Accordingly, summary judgment should be granted on this claim.

The plaintiff also alleges in his complaint that he spoke with several of the officers who were supervisors of Officer Golden.  The plaintiff alleges he spoke with Captain Mauney, Captain Randall, Sgt. Bennett, Lt. Byrd, and Sgt. Williams.  The plaintiff appears to state in his complaint that these defendants were made aware of the situation but failed to take any action, stating instead that Officer Golden could essentially proceed as she wished. Each of these officers testified that as supervisors, they monitor the conduct of the officers under their command and if an officer was doing something improper, such as denying an inmate a meal, they would immediately correct the situation.  If they felt the officer was doing something improper, they would immediately correct the behavior.  The plaintiff claims that he spoke with Captain Mauney on one occasion concerning his issues with Officer Golden and that she stated she would have Officer Golden removed from SMU. Captain  Mauney does not recall any specific conversation with the plaintiff, but she stated in her affidavit that she conducted rounds and may well have spoken with him during this time.  While doing rounds, numerous inmates will speak with her and ask her questions, and she will address those issues.  However, these matters would not be generally written down unless there was some specific matter which needed to be addressed.  She further stated that at no time did she state to the plaintiff that she would have Officer Golden

removed from the SMU as there would be no basis for her removal. She does recall that the plaintiff sent her a written request concerning Officer Golden on one occasion, but she does not recall that he alleged that Officer Golden was denying him or tampering with his food. Instead, the plaintiff forwarded a Request to Staff alleging that Officer Golden was having an improper sexual relationship with another officer and an inmate in SMU. Captain Mauney investigated these allegations and determined they were baseless (Mauney aff.). The plaintiff has clearly failed to show any type of constitutional violation by defendant Mauney based on the allegations set forth in his complaint.

The plaintiff also contends that he complained about Officer Golden to Captain Randall. Captain Randall testified that he does not recall any issues raised by the plaintiff concerning Officer Golden or an alleged failure to provide him with food trays. Though he does not remember these type of allegations, he does recall that the plaintiff had a great deal of animosity toward Officer Golden. He recalls one occasion where the plaintiff asked him or another officer for Officer Golden's badge number so that he could file a lawsuit against her. Captain Randall told the plaintiff that he only needed Officer Golden's name in order to file a lawsuit. Again, though he does not recall any allegations concerning food, he states that the plaintiff did make statements to him such as "I'm tired of her" and "I'm going to file a lawsuit on her." He further testified that the plaintiff would make improper comments concerning Officer Golden and called her various improper names. It is also his testimony that Officer Golden primarily stayed in the control room, and it was very rare that she delivered food trays to inmates or assisted out of the control room. Captain Randall also testified that he was aware that the plaintiff had exposed himself to Officer Golden on one or more occasions. Captain Randall stated that disciplinary charges were filed against the plaintiff for exposing himself on at least one occasion. The plaintiff also made statements to Officer Golden which, even if they were not direct threats, concerned both Officer Golden and Captain Randall, and Officer Golden ultimately made a request for

10

separation from the plaintiff that Captain Randall supported (Randall aff.). As a result of Officer Golden's separation request, the plaintiff was transferred to another institution (Golden aff.).

The plaintiff also has brought suit against Warden Bazzle. Warden Bazzle stated that he has no independent recollection of receiving any requests from the plaintiff concerning being denied his food tray. Warden Bazzle receives numerous inmate requests on a daily basis, but stated if he received a request of this nature he would have investigated this matter (Bazzle aff.).

It is well settled that liability in civil rights cases brought under 42 U.S.C. § 1983 may not be premised upon a *respondeat superior* theory. *See Polk County v. Dodson*, 454 U.S. 312, 325-26 (1981) and *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694 (1978). The plaintiff must establish three elements to hold a supervisor liable for a constitutional injury inflicted by a subordinate: (1) the supervisor had actual or constructive knowledge that a subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to people like the plaintiff; (2) the supervisor's response was so inadequate as to constitute deliberate indifference or tacit authorization of the subordinate's conduct; and (3) there is an "affirmative causal link" between the supervisor's inaction and the plaintiff's constitutional injury. *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir.), *cert. denied*, 513 U.S. 813 (1994). As set forth above, the plaintiff has failed to show a constitutional injury inflicted by Officer Golden, and he has failed to establish issues of material fact with regard to the three elements necessary for supervisory liability. Accordingly, the plaintiff's claims against Officer Golden's supervisors fail.

*Disciplinary Offenses*

The plaintiff also alleges that he was improperly convicted of disciplinary offenses. DHO Turner, who heard and ruled on the plaintiff's disciplinary offenses, set forth in his affidavit the procedure for disciplinary hearings. In conducting a disciplinary hearing, DHO Turner will first turn on the tape recorder and have the inmate introduce himself, then he will introduce himself and state specifically whether the inmate is represented by a counsel substitute and, if so, the name of the counsel substitute. If the plaintiff is not represented by a counsel substitute, he states why this is the case, such as the inmate waived his right to a counsel substitute. He then states the formal charge and reads the definition of the charge into the record. If the inmate requests his accuser to be present, he has the accuser present, either in person or by telephone. He next reads the narrative of the incident report or charging documents into the record. After reading the charges into the record, he informs the inmate of the potential consequences of a guilty verdict. He next verifies with the inmate that he was served notice, who served the notice, and when it was served. He then restates the charges and asks the inmate for his plea. If the inmate pleads not guilty, he allows the inmate to put his statement on the record of how the incident occurred. After the inmate puts his statement on the record, the inmate is allowed to present any witnesses or other forms of evidence relevant to the charge and to ask questions of the witnesses. He also gives the inmate the opportunity to ask questions of the accusing officer. After he hears all evidence, he asks the inmate and officer, if present, to step out of the room and reviews all materials in order to make a decision based on the evidence before him. After he makes a decision, he brings the inmate back into the room and again has him identify himself on the record. After the inmate identifies himself on the record, he informs the inmate of his decision, the basis of his decision, and if the inmate is found guilty, informs the inmate of his sanctions, his right to appeal, and that he must effectuate the appeal, including that the appeal must be done within 15 days of the date of

the hearing. DHO Turner testified that at all times his decisions were based on the evidence before him (Turner aff.).

In *Superintendent, Massachusetts Correctional Institution v. Hill*, 472 U.S. 445 (1985), the Supreme Court set out the constitutional evidentiary standard to be used when courts review prison discipline decisions. It held that the Due Process Clause is satisfied if there is "some evidence" to show that the inmate committed the offense. *Id*. at 455. The Court declined to adopt a more stringent evidentiary standard as a constitutional requirement, stating:

> Prison disciplinary proceedings take place in a highly charged atmosphere, and prison administrators must often act swiftly on the basis of evidence that might be insufficient in less exigent circumstances. The fundamental fairness guaranteed by the Due Process Clause does not require courts to set aside decisions of prison administrators that have some basis in fact.

*Id*. at 456. The "some evidence" standard is a lenient one, requiring no more than "a modicum of evidence," and is met if there is any evidence in the record that could support the board's decision. *Id.* at 455-56. This standard requires "only that the decision not be arbitrary or without support in the record." *McPherson v. McBride*, 188 F.3d 784, 786 (7th Cir. 1999). As the Supreme Court noted in *Hill*,

> Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board.

472 U.S. at 455-56. Upon review of a disciplinary proceeding, the court should determine only whether the DHO's decision to revoke good time credits has some factual basis. *Hill*, 472 U.S. at 456; *McPherson*, 188 F.3d at 786.

The evidence before this court reveals that there was "some evidence" to support the DHO's decisions (Turner aff.). DHO Turner testified in his affidavit that he

13

considered the evidence before him, including the incident reports and statements from the officers, as well as the statements from the plaintiff in reaching a decision in each of the hearings involving the plaintiff. Based on his review of the evidence, he determined that the plaintiff was guilty of the charges in these matters. The plaintiff has failed to demonstrate that specific, material facts exist that give rise to a genuine issue. Accordingly, the claim regarding his disciplinary proceedings fails.

The plaintiff also apparently claims that defendant Fowler, the Grievance Coordinator at Perry, did not properly handle his grievances. Mr. Fowler testified in his affidavit that one of the plaintiff's grievances was returned unprocessed as the allegations raised in the grievance did not pertain to the plaintiff (Fowler aff. ¶ 29), and another grievance was returned unprocessed because the plaintiff had failed to attempt informal resolution as required under SCDC policy (Fowler aff. ¶ 33). Mr. Fowler informed the plaintiff that he could refile that grievance after attempting an informal resolution, but the plaintiff failed to refile his grievance (Fowler aff. ¶¶ 35-36). Mr. Fowler testified that once he receives an inmate grievance, he will investigate the facts surrounding the grievance, including speaking with the officers and the inmate. The plaintiff has, as referenced above, filed a number of grievances, including appeals of disciplinary convictions. After completing his investigation Mr. Fowler will make a recommendation, based on the evidence before him, and provide a proposed response to the Warden. The Warden reviews the inmate's grievance, along with the recommendation made by Mr. Fowler, and responds to the grievance. The inmate then has the right to appeal this decision. Mr. Fowler testified that at all times in handling the plaintiff's grievances he has acted in accordance with SCDC policy and has made decisions based on his investigation into the facts before him. At no time did he act in an arbitrary or capricious manner (Fowler aff.).

As argued by the defendants, the grievance procedure is a procedural right, not a substantive right. *See Brown v. Dodson*, 863 F.Supp 284 (W.D. Va. 1994).

Therefore, a state's inmate grievance procedure does not give rise to liberty interests protected by the Due Process Clause. As a state grievance procedure does not give any substantive constitutional right to prison inmates, a prison official's alleged failure to comply with the state's grievance procedure is not actionable under Section 1983. *Id.* Further, even if there was some type of substantive right created, courts have stated that "'[i]n reviewing prison administrative actions in Section 1983 actions, the Court must uphold the administrative decision unless it was arbitrary and capricious.'" *Gartrell v. Gaylor*, 866 F.Supp. 325, 330 (S.D. Tex. 1994) (quoting *Stewart v. Digpen*, 730 F.2d 1002, 1005 (5th Cir. 1984) (further citation omitted). The Court went on to state that "[a] decision is not arbitrary and capricious if it was made `by a specific exercise of professional judgment and on the basis of factors clearly bearing on the appropriateness [of the decision at issue].'" *Id.* at 330-31 (quoting *Spuler v. Pickar*, 958 F.2d 103, 107 (5th Cir. 1992)). Mr. Fowler stated that he handled the grievances appropriately in accordance with SCDC policy and did not act in an arbitrary or capricious manner. The plaintiff has failed to show issues of material fact on this issue. Accordingly, the claim fails.

### *Qualified Immunity*

The defendants further claim that they are entitled to qualified immunity. This court agrees. Qualified immunity protects government officials performing discretionary functions from civil damage suits as long as the conduct in question does not "violate clearly established rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This qualified immunity is lost if an official violates a constitutional or statutory right of the plaintiff that was clearly established at the time of the alleged violation so that an objectively reasonable official in the defendants' position would have known of it. *Id.*

In addressing qualified immunity, the United States Supreme Court has held that "a court must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all and, if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Wilson v. Layne*, 526 U.S. 603, 609 (1999); *see also Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). Further, the Supreme Court held that "[d]eciding the constitutional question before addressing the qualified immunity question also promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public." *Wilson*, 526 U.S. at 609. If the court first determines that no right has been violated, the inquiry ends there "because government officials cannot have known of a right that does not exist." *Porterfield v. Lott*, 156 F.3d 563, 567 (4th Cir. 1998).

In this case, as set forth above, the plaintiff has failed to demonstrate that the actions of the defendants violated any of his constitutional rights. Therefore, the defendants are entitled to qualified immunity.

## **CONCLUSION AND RECOMMENDATION**

Wherefore, based upon the foregoing, this court recommends that the defendants' motion for summary judgment be granted. The plaintiff's pending nondispositive motions will be held in abeyance pending the district court's disposition of the motion for summary judgment. Should the district judge adopt this court's recommendation, these motions will be rendered moot.

s/William M. Catoe
United States Magistrate Judge

June 27, 2007

Greenville, South Carolina